The Law Office of James M. Branden
551 Fifth Avenue
New York, New York 10176
Tel. 212-286-0173
Fax 212-286-0495


June 5, 2020


Hon. Ronnie Abrams
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  United States v. Paul Calder Leroux
     Cr. Docket Nos. 12-489 (RA); 14-75 (RA)

Dear Judge Abrams:

     I represent Mr. Leroux who is to be sentenced in the above-
referenced matter on June 12, 2020.  For the reasons set forth
below, I request that Mr. Leroux be sentenced to time served,
the equivalent of 92 months.

## STATEMENT OF THE CASE

Background

     Mr. Leroux was born in 1972 in what is now Zimbabwe (PSR.
31, ¶166).   His  unwed  parents  placed  him  for  adoption
immediately and he was adopted by ██████████ (PSR.
31, ¶¶166-167).  ████ is a retired military engineer and illegal
diamond smuggler living in South Africa (PSR. 31, ¶167).  ████
passed in 2013 at the age of 70 (PSR. 31, ¶167).

     ████ was an alcoholic and a drug addict (PSR. 31, ¶167).
He was also brutally abusive to both Judith and Mr. Leroux (PSR.
31, ¶¶167-168).  ██████████ divorced when Mr. Leroux was
fifteen years old and he lived with ████, whom he adored,
until adulthood (PSR. 31, ¶168).   Mr. Leroux believes that the
domestic violence he witnessed during his parents' marriage has
negatively affected his own adult relationships (PSR. 31, ¶168).

     For the past 15 years or so, Mr. Leroux has been totally

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 2

estranged from his father and his only sibling, ███████, whom he believes to be a religious zealot (PSR. 31, ¶¶167, 169).

Mr. Leroux had a miserable and at times terrifying childhood in Zimbabwe, then in civil war. He described his neighborhood as a "war zone" where he witnessed the Mugabe regime torture and murder the citizenry. Food was rationed and scarce (PSR. 32, ¶171).

When he was ten years old, Mr. Leroux was sent away to



He spent six years at the school, until his parents' divorce, whereupon he was schooled locally near his mother's new residence in South Africa (PSR. 32, 35, ¶¶170, 194).

Mr. Leroux graduated high school in South Africa in 1988 (PSR. 35, ¶194). He graduated from a technical school there in 1992. Thereafter he moved to London and worked as a programmer at Barret Edwards Int'l, creating document management systems principally for law firms (PSR. 35, ¶201). In 1994, he moved to Sydney, Australia, and continued his work in programming (PSR. 35, ¶201).

They married in Australia the following year, ██████████ The couple rarely saw each other and the marriage "quickly dissolved" (PSR. 32, ¶174).

In 1998, Mr. Leroux moved to Hong Kong and worked as a programmer for New Era of Networks (PSR. 35, ¶200). They courted and married a year later in the Bahamas (PSR. 33, ¶175).

In 2000, Mr. Leroux moved back to London and a new position at Barret Edwards Int'l. He then moved on to design encryption

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 3

programs for computer hardware at Crypto Solutions.  In 2003, he moved to Rotterdam and worked for Secur Star, a company based in Germany and owned by Wilfred Heffner[1] (PSR. 35, ¶199).

In 2004, Heffner asked Mr. Leroux to perform programming and website design for an online pharmacy business, known as Atlas Pharmacy, which sold prescription drugs in the United States through its website.  The drugs were purchased through a wholesaler in Brazil by paying bribes to the wholesaler's employees.



Heffner left the online pharmacy business but Mr. Leroux was just getting started.

From 2004 to 2012, Mr. Leroux's principal source of revenue was his operation of Rx Limited, an online pharmacy business targeting U.S. customers and issuing prescriptions for Tramadol (an opioid analgesic), Soma (a muscle-relaxant) and Fioricet (a combination of acetaminophen and butalbital, a barbiturate). The operation of this business underlies the charges in 14 Cr. 75 (RA).

During his marriage to

The marriage ended in 2013 and

Nonetheless, Mr. Leroux continues to support them all financially (PSR. 33, ¶175).



---

[1]  The true spelling of his last name is "Hafner," but to avoid confusion, I refer to him as Heffner throughout.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 4



    Also during the marriage, from 2007 to 2012, ███████████████ ████████████████████████████████████████████ Together they have ███

    As set forth in the presentence report, over the years, Mr. Leroux had shorter-term relationships, as well. These relationships have resulted in

    Mr. Leroux suffers from

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 5



The Offense Conduct

The offense conduct was detailed in the presentence report
(at 5-26, ¶¶15-114) and in the government's §5K1.1 motion (at
section II).  Mr. Leroux has no objection to the stated conduct
or the Guidelines calculation set forth in the report (at 26-30,
¶¶117-159).   He notes here only that his foray into the
prescription drug on-line business, which proved to be an engine
to all of his criminality, lacked corrupt intent.  He consulted
with a lawyer who only advised him that selling drugs using
prescriptions issued based on online questionnaires "could be

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 6

illegal." He was advised that if he dared to open the business, he should at least be careful not to sell drugs listed on the Schedules of the Controlled Substances Act (CSA). While Mr. Leroux perhaps took a risk in opening the business, he sought to minimize the risk by selling only in States with vague doctor-patient laws that may have allowed online questionnaires instead of in-person visits to a doctor. Further, he heeded counsel's advice and regularly screened the CSA Schedules to make sure he did not sell drugs listed thereon. When, for example, Soma was added to the Schedules in 2012, Rx Limited immediately stopped selling it. And, as to Fioricet, Mr. Leroux was simply mistaken in his belief that the drug was un-Scheduled.

The money poured in. Over time most States explicitly prohibited prescriptions based on online questionnaires, but by then Mr. Leroux was earning too much to stop. Rather than shutter the business, and driven now by greed, he sold in States that would subject his manner of drug sales to civil or administrative penalties only and avoided those that could prosecute him criminally. Other depravity ensued (e.g., payments to attorneys for fraudulent opinion letters as to the legitimacy of Rx Limited's business to banks that process credit card payments to the pharmacies, fake online websites, frauds perpetrated on Visa, American Express, Diner and FedEx, smuggling of Tramadol into the United States). And, as noted above, money from Rx Limited, corruptly earned, fueled most of the remaining criminality leading to the most severe total offense level under the Guidelines.

<u>Mr. Leroux's Cooperation</u>

The government's §5K1.1 motion is comprehensive. Mr. Leroux seeks only to highlight here certain aspects of his assistance to the government.

- One, he cooperated early. Indeed, he started to speak with law enforcement on the flight from Liberia, even before he reached the Southern District of New York, where he was presented.

- Two, the level of cooperation was extraordinary. Though I was not his counsel at the time, I am informed that Mr.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 7

Leroux attended scores of proffer sessions and spent more time debriefing agents than any other defendant in SDNY history.

- Three, he was at all times forthright and the information provided was "voluminous" and "detailed" (motion at 41). Some of his early proffers suffered from minimization (as most do), but in time he made full admissions even as to the murders. And, as noted in the government's motion, but for count one (the importation and distribution of methamphetamine), evidence of the remaining charges in 12 Cr. 489 (RA) was insufficient at the time of arrest and depended principally on Mr. Leroux's proffers. So, too, the charges contained in 14 Cr. 75 (RA) were not brought prior to Mr. Leroux's arrest and "[i]n the course of his post-arrest admissions, Leroux provided significant additional information . . . as well as access to electronic records" (motion at 38).   Last, even further uncharged but relevant conduct, including all of the violence, was too vague and amorphous for use at sentencing before meetings with Mr. Leroux (motion at 38).[2]

- Four, Mr. Leroux did not just provide historical information.  He also "engaged in communications with various associates in furtherance of ongoing investigations" (motion at 43).   These undercover investigations "led to the dismantling of Leroux's [Rx Limited] enterprise and the arrests of over a dozen of his criminal associates" (motion at 43), including his mercenary team of killers (Joseph Hunter, Timothy Vamvakias, Dennis Gogel, Slowamir Soborski and Michael Filter) and his narcotics partners (Ye Tiong Tan Lim, Kelly Pealta, Phillip Shackels, Scott Stammers and Adrian Valkovic) (motion at 43-46).   Further, he personally financed many of these undercover investigations, including money for, *inter alia*, continued salaries of targets, fuel

---

[2]  In its 5K1.1 motion, the government indicated that it had some knowledge of the Lee murder (motion at 38).  Mr. Leroux recalls, however, that he provided all the information about that murder and that the agents knew nothing about it previously.  He recalls that he even had to spell her name.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 8

costs, pilot costs, payments to foreign governments. The
total expended was in excess of $2 million. He also
provided information about his exploits with the Government
of Iran and embarked on a proactive investigation to trade
weapons and technology, which through no fault of his own,
failed to reach fruition (motion at 43).

- Five, Mr. Leroux alerted the government to assets located
overseas and consented to their forfeiture (e.g., gold and
bank accounts in Hong Kong with a combined value of
approximately $14 million, numerous homes and boats, a
plane).[3]  He also alerted the government to assets in the
United States, such as a stash of 2-3 million Tramadol
pills, valued at more than $1 million. In all, Mr. Leroux
forfeited roughly $20 million.

- Six, Mr. Leroux testified at the trial of Hunter, Samia and
Stillwell and gave compelling testimony over the course of
three days leading to a guilty verdict on all counts
(motion at 48) and he testified truthfully at a suppression
hearing in the case involving his Rx Limited business
associates (motion at 48-49). Further, he was prepared to
testify in the trial in Minnesota. His 3500 material was
disclosed to defense counsel and he was transferred to
Minnesota in 2017 where he spent a month in solitary
confinement awaiting the trial, but was not called as a
government witness.[4]

---

[3] To be specific as to the boats, there were: one used in
connection with the Hunter investigation, valued at $250,000;
one in connection with the Guinea Bissau investigation valued at
$2 million; four others located in Ecuador, Panama and Thailand,
worth in excess of $300,000 and a $150,000 sailboat (which
contained 200 kg of cocaine).

[4] In its 5K1.1 motion, the government observed that, at the
time of his arrest, Mr. Leroux had also been under investigation
by the DEA's Minneapolis Division Office and the Consumer
Protection Branch of the Department of Justice (motion at 36).
Mr. Leroux believes that a Minneapolis grand jury refused to
indict him on one or two occasions. Mr. Leroux later agreed to
be indicted.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 9

- Seven, his cooperation was enormously beneficial. Suffice it to note well more than 20 arrests were made based on Mr. Leroux's accounts and most of the arrests led to convictions, including those of the mercenary kill team and Mr. Leroux's narcotics partners.

<u>Mr. Leroux's Good Behavior in Detention</u>

In its §5K1 motion, the government noted that Mr. Leroux misbehaved on three instances while at GEO. The instances were relatively minor (providing money to another inmate for commissary, phone minutes and a computer; use of the attorney phone to contact that inmate once he was transferred; and providing money to kitchen staff for extra food) (motion at 50).[5] It merits noting, however, that he also worked hard to improve himself (Exhibit J: Certificates for 23 weeks of coursework completed in: parenting skills, relapse prevention, and anger management).

<u>The Leaks</u>

The matter of *United States v. Calder Leroux* was under seal until Judge Loretta A. Preska ordered the matter unsealed on March 5, 2016. Prior to this date, the case against Mr. Leroux, including the superseding indictment, which was not entered until March 16, 2016, should have been unavailable to the public if all parties involved followed proper procedure. We know now that this procedure was not followed. In fact, certain documents which should always stay confidential, regardless of unsealing, such as proffer session notes and DEA surveillance video were leaked to the press, and consequently to the public. The sensitive nature of this material was acknowledged by the government when it applied for a protective order in the matter of *United States v. Hunter* (Exhibit K: 13-cr-521 (RA), ECF No. 38). This application was granted, and a protective order issued by Judge Swain on December 2, 2013. *See id.* As detailed in the

---

5

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 10

protective order, the risk to informants and their families
created by proffer material and discovery necessitated that it
be disclosed to and meant for defendant and his counsel only.
Further establishing the comprehensive and at-risk nature of the
3500 material, Judge Abrams also ordered that all 3500 material,
along with any witness list, must be destroyed or returned to
the government at the conclusion of trial (Exhibit L: 13-cr-
521 (RA), ECF No. 530).

There was no shortage of 3500 material documenting Mr.
Leroux's cooperation. As discussed in the government's §5K1.1
letter, Mr. Leroux regularly met with the government several
times a week over the course of several months. In addition, he
participated in an elaborate undercover scheme to assist law
enforcement in the continued dismantling of his criminal empire
and apprehension of known associates. The amount of inculpatory
information Mr. Leroux provided in good faith cannot be
overstated. Mr. Leroux's cooperation was so vital-the wellbeing
of their star informant so important, that after his
arrest, the government created the appearance that he was not
detained for over a year, even though he was in federal custody.
While Mr. Leroux fulfilled his end of the cooperation
agreement, individuals on the government's end did not.
Failing to observe even the paramount tenet of confidentiality,
Mr. Leroux's 3500 and discovery material were leaked to both
authors and the media. As a result, the lives of Mr. Leroux and
his loved ones are now in grave danger. *See infra*.

A careful comparison between the trial transcript, 3500
material, Presentence Report ("PSR") and text of Hunting Leroux,
clearly reveals that Mr. Leroux provided the disclosed
information in confidential sessions, and not through trial
testimony. This information was disseminated by a person who
attended such meetings, or accessed recordings and notes of the
meetings, in confidence. The fact that Hunting Leroux even
includes actual dialogue between Mr. Leroux and agents in
attendance, such as Agent Stouch and Agent Cindric, is
preposterous.

During Mr. Leroux's September 27, 2012 proffer session, Mr.
Leroux stated that he started working with Wilfred Heffner in
2004 to create an illegal web-based prescription medicine

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 11

company (Exhibit M: 3507-2, Proffer of Paul Calder Leroux,
dated September 27, 2012, page 6). Although she spells his
name differently, Shannon accurately details the proffer
wherein Mr. Leroux discusses his relationship with Mr. Heffner
(Exhibit N: Hunting Leroux, pages 525-26). During this session,
Mr. Leroux also explained that he needed to import certain
materials that were barred from import by Philippine
authorities (Exhibit O: 3507-2, Proffer of Paul Calder Leroux,
dated September 27, 2012, page 16). He explained that he was
informed that a North Korean submarine could be had for
$5,000,000. *Id.* However he felt that this was too expensive
and promptly recruited a team to build his own 10m and 30m
submarines at his shipyard. *Id.* This account, down to Agent
Cindric's own enthused questioning and the submarine
measurements, was reflected in Hunting Leroux (Exhibit P:
Hunting Leroux, pages 355-56). During this session, Mr. Leroux
also explained his relationship with Iranian officials, who
contracted him to develop weapons and chemical formulae for
them. He detailed the various plans he worked on, including
"PETN", or pentaerythritol tetranite, a component of military
plastic explosives utilizing coffee sweetener, as well as
payment in gold bars worth about $5,000,000 (Exhibit Q: 3507-
2, Proffer of Paul Calder Leroux, dated September 27, 2012, page
13). He explained how he delivered them to Iranian officials in
a manner they found acceptable. *Id.* Mr. Leroux set up a secure
online server by which Iranian scientists could access plans
that he uploaded, making the transaction difficult to trace.
*Id.* Shannon describes the intricate relationship and plans,
including specific weapons, chemicals, and payment, as well as
the thought process behind the ingenious delivery system
utilizing an "FTP" server (Exhibit R: Hunting Leroux, pages
348- 50). It is important to note that nowhere in his
proffer does Mr. Leroux refer to an FTP server. However the
government did detail the basics of a an FTP server to
pretrial for preparation of Mr. Leroux's presentence report
(PSR. 13, ¶44).

During his October 8, 2012 proffer session, Mr. Leroux
stated that while in the United Kingdom, he worked for GCHQ, the
UK equivalent of NSA (Exhibit S: 3507-5, Proffer of Paul
Calder Leroux, dated October 8, 2012, page 16; see also Exhibit
M: 3507- 2, Proffer of Paul Calder Leroux, dated September 27,

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 12

2012, page 6). Shannon reported the same, with added historical background, in Hunting Leroux. (Exhibit T: Hunting Leroux, page 110)

During his October 22, 2012 proffer session, Mr. Leroux detailed how he established his relationship with a man he knew only as "the Accountant" (Exhibit U: 3507-10, Proffer of Paul Calder Leroux, dated October 22, 2012, page 6; see also Exhibit V: 3507-17, Proffer of Paul Calder Leroux, dated November 27, 2012, page 2). Shannon reported the relationship and the specific bombings almost down to the exact word (Exhibit W: Hunting Leroux, pages 353-54) (PSR. 34, ¶¶113-114). During this session, Mr. Leroux also detailed his relationship with an official within the Philippine Department of Foreign Affairs he dubbed "Dragnet Man" (Exhibits X and U: 3507-10, Proffer of Paul Calder Leroux, dated October 22, 2012, pages 5-6). He was able to acquire various documents on foreign diplomats for a fee as insurance in case these diplomats decided to interfere with his operations. Id. Shannon details this extremely confidential relationship, and the official documents acquired, in her novel (Exhibit Y: Hunting Leroux, pages 347-48).

During his November 22, 2012 proffer session, Mr. Leroux stated that Google was attempting to curb prescription drug abuse by preventing online pharmacies from participating in the Google AdWords program (Exhibit Z : 3507-16, Proffer of Paul Calder Leroux, dated November 22, 2012, page 4; see also Exhibit AA: 3507- 13, Proffer of Paul Calder Leroux, dated November 13, 2012, pages 4-5). Mr. Leroux explained to government agents how he sidestepped the Google safeguards by rerouting Google probes to fake websites during their verification process. Id. Shannon details this elaborate scheme, step by step, in her own words (Exhibit BB: Hunting Leroux, page 141). In Hunting Leroux, Elaine Shannon erroneously notes that Chris Miller, a man Mr. Leroux recruited to bribe a Namibian judge, died of heart disease shortly after returning from his venture (Exhibit CC: Hunting Leroux, page 369). This was the same mistake made by the government when providing cause of death to pretrial (PSR. 17, ¶68). Mr. Leroux provided the correct cause of death during his November 22, 2012 proffer session. Mr. Miller had actually died of a stroke (Exhibit DD: 3507-16, Proffer of Paul

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 13

Calder Leroux, dated November 22, 2012, page 2). The fact
that government agents disseminated confidential details at
least up until the drafting of Mr. Leroux's presentence report
is extremely unsettling.

During his November 27, 2012 proffer session, Mr. Leroux
disclosed in great detail that he purchased a boatyard in the
Batangas Province of the Philippines and was told he needed to
pay the local NPA guerillas approximately the equivalent of
$1150 monthly for protection (Exhibit EE: 3507-17, Proffer of
Paul Calder Leroux, dated November 27, 2012, pages 2-3).
Shannon's account is an exact match down to the very last
detail, except for misstating that Mr. Leroux paid $1200
monthly instead of $1150 (Exhibit FF: Hunting Leroux, pages
353-54).

The government leaks were not limited to material provided
during Mr. Leroux's numerous proffers. It is concerning that
even highly privileged discovery material was detailed  in
Hunting Leroux. Shannon writes about a recorded call where Mr.
Leroux requests the presence of a master chemist at a meeting
with the Colombian Cartel and even includes a  transcript
(Exhibit GG: Hunting Leroux, page 285-86). Shannon discloses
another recorded call between Mr. Leroux and his codefendant as
they discuss a sample of meth (Exhibit HH: Hunting Leroux, page
322). It is no surprise that highly privileged material was
improperly disseminated. Shannon's source knew no bounds when
disclosing material on Mr. Leroux. Even intimate details of Mr.
Leroux and Ms. Cayanan's love life, taken from audio recorded
using a bug, were documented in Hunting Leroux (Exhibit II:
Hunting Leroux, page 314). This audio was also part of
discovery and handed over to Shannon.

The government will argue that the information made public
was all disclosed in the trial of Joseph Hunter. However, it is
important to note that missing details and inconsistencies
between Mr. Leroux's trial testimony and the subject novels cast
serious doubt upon the government's claim.

- When Mr. Leroux testified at trial on his weapons
  contract work with Iran, he discussed his work on an
  explosive called "ETN", but not "PETN", which is the

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 14

explosive that Shannon so affectionately dubbed the "coffee sweetener bomb". (Exhibit JJ: <u>U.S. v. Hunter</u> Tr., page 359).

- Mr. Leroux testified at trial that "the Accountant" was a rebel leader in the Philippines, but did not mention the militant group, NPA (Exhibit KK: <u>U.S. v. Hunter</u> Tr., page 409). This information was provided during proffer. Additionally, Mr. Leroux proffered that "the Accountant" was only associated with NPA, and did not mention him as a leader until he testified at Mr. Hunter's trial. Shannon's account is clearly based off the 3500 material, and not Mr. Leroux's trial testimony.

- When Mr. Leroux recounted the bribery of the Namibian judge at Mr. Hunter's trial, he did not mention Mr. Miller or his cause of death (Exhibit LL: <u>U.S. v. Hunter</u> Tr., page 523). In fact he did not go much further than referring to Mr. Miller as "somebody". *Id.*

- When testifying on his relationship with an insider at the Philippine Department of Foreign Affairs, he allowed his contact to be called the "Dragnet Guy" (Exhibit MM: <u>U.S. v. Hunter</u> Tr., page 743-44). He also denied knowledge of specific documents he had acquired through Dragnet Guy. *Id.* However, in his proffer, Mr. Leroux specifically referred to his contact as the "Dragnet Man", and recounted numerous documents the Dragnet Man retrieved for him, their contents, and the detailed purposes for their respective retrievals.

- When Mr. Leroux testified about building his own submarine, instead of purchasing one from North Korea, he did not mention that he planned to build two submarines, one 10m long, and one 30m long (Exhibit NN: <u>U.S. v. Hunter</u> Tr., page 534-35). He stated that he recruited a team to build a "small, one-man submarine." *Id.* When he revisited the topic during a later session of trial, Mr. Leroux again reiterated that he was designing "a" submarine (Exhibit OO: <u>U.S. v. Hunter</u> Tr., page 573). During summation by Mr. Hunter's counsel, he reiterated that Mr. Leroux was designing "a submarine" (Exhibit PP: <u>U.S. v. Hunter</u> Tr., page 1865). Mr. Leroux's plan to build a 10m and 30m submarine were clearly derived from his proffer material. In fact, in both the proffer notes and <u>Hunting Leroux</u>, Mr. Leroux clarifies that the design for

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 15

the 10m submarine was already complete when he was arrested.

Further refuting the government's claim, the trial of Joseph Manuel Hunter and his co-defendants did not commence until April 2018. Details of Mr. Leroux's arrest and cooperation were leaked to the press as early as December 2013 (Exhibit QQ: File 26, South African coordinates Rio scheme in 40 countries of drug and arms trafficking, dated December 26, 2013). The article reveals Mr. Leroux's cooperation even while his case was under seal, and the massive criminal investigations he helped spark, which were confidential, were also detailed. A New York Times article from 2014 is even more preposterous. In this article, the reporter, Alan Feuer, even states that two of his primary sources are federal agents, one current, and one retired (Exhibit RR: File 12, In Real Life, Rambo, dated December 20. 2014). The agents reveal a wealth of information about Mr. Leroux, obviously focusing on the details that would attract the general public. *Id.* This article, and the leaks upon which it was written, also preceded the unsealing of Mr. Leroux's case, and the trial of Joseph Hunter.

The subject leaks also included confidential discovery material. DEA surveillance footage, was leaked to a publisher in efforts to promote <u>Hunting Leroux</u> (YouTube Video, <u>Hunting Leroux</u> by Elaine Shannon, <https://www.youtube.com /watch?v=EczYpgtc3IA>), and to CNA for their production of a documentary on Mr. Leroux (YouTube Video, <u>The Making of a Criminal Mastermind</u>, <https://www.youtube.com/watch?v=hQxPwA7yGjk>). Regardless of when these videos were published on YouTube, the actual DEA surveillance footage of Mr. Leroux should never have left the hands of the specific parties mentioned in the protective orders. These leaks were certainly not a product of Mr. Leroux's trial testimony, as the government alleges.

In her Note to Readers, Shannon herself appreciatively details the incredibly "rare access to firsthand witnesses" she had (Exhibit SS: <u>Hunting Leroux</u>, Note to Readers). Over the course of six years she was able to interview individuals with direct knowledge for "thousands of hours." *Id.* Even

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 16

assuming that Shannon worked on <u>Hunting Leroux</u> right up until
its publication in February 2019, which is highly unlikely,
this means that the improper leaks started as early as
February 2013, well before the matter was beginning to be
unsealed. Shannon also had access to "thousands of documents,
including government documents, personal notes, diaries,
emails, texts, timelines, photos, transcripts, undercover audio
and videotapes, and documents seized from people investigated
and prosecuted for crimes. *Id.* The amount of accurate dialogue
from both proffers and confidential surveillance footage in
<u>Hunting Leroux</u> surely backs up her claims. Additionally,
Shannon states that his 3500 material was contained in the
Proposed Cooperation Agreement, signed February 4, 2013
(Exhibit TT: <u>Hunting Leroux</u>, page 527). Furthermore she states
that the Agreement was "not made part of the public court
record but was obtained by the author. *Id.* In a video
interview of Michael Mann, Elaine Shannon, and Agents Milione
and Cindric, a guest asks the agents how much information
needed to be withheld from Shannon during the process
(YouTube Video, Michael Mann, Elaine Shannon, Lou Milione &
Tommy Cindric Speak On "<u>Hunting Leroux,</u>
<https://www.youtube.com/watch?v=MTeonvkHKDk> at 32:41). Agent
Cindric first attempts to deflect by stating that unless
privileged, which the leaked material certainly was, criminal
cases are publicly available on PACER. *Id.* Agent Milione then
clarifies that they were given clearance to speak with Shannon
that they normally wouldn't have with anybody. *Id.* This Court
need not look much further when trying to determine the
government agents who leaked the material. Accordingly, this
Court should find that not only were the leaks highly improper
and of an unprecedented scale, but that the two aforementioned
government agents were the source, and not Mr. Leroux's trial
testimony.

<u>The Significance of the Leaks</u>

     Protective orders consider the danger of leaked material
not only to the informant, but also to his or her family.
Retribution and intimidation know no bounds. This rings truer
when those who might seek revenge include foreign government
officials, mercenaries, and drug cartels. With Mr. Leroux in
federal custody, individuals whom he incriminated can only seek

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 17

serious recourse through harming his loved ones. This is not to
say that Mr. Leroux does not face any threats in prison. In
Hunting Leroux, Mr. Leroux tells his handlers that he was
assaulted while in custody (Exhibit UU: Hunting Leroux, page
501).

Shannon's novel lays out Mr. Leroux's first proffer at the
Marriot Hotel with an alarming level of detail (Exhibit VV:
Hunting Leroux, pages 365-67). Every attorney in attendance,
both defense and prosecution, is named. Id. Agent Cindric leaves
little room for doubt as to his level of involvement when he
reflects that "[Mr. Leroux] was driving that train." Id. These
pages cement Mr. Leroux's involvement as an informant, and
ultimately damn him and his loved ones to a lifetime of looking
over their shoulder.

Government agents leaked confidential material with wanton
disregard for the safety of both Mr. Leroux and his family.
Shannon's government source identifies Mr. Leroux's mother of
two of his children, ████ ██████, by name (Exhibit WW:
Hunting Leroux, page 99). The leaks included body cam footage
from a CI that clearly depict the face of one of Mr. Leroux's
children and the mother of the child (Exhibit XX: Hunting
Leroux, page 289). Later, Shannon reveals the exact number of
Mr. Leroux's baby mothers and children, allowing one seeking
revenge to begin constructing a comprehensive checklist (Exhibit
YY: Hunting Leroux, page 405). Shannon later reveals the
approximate weight and height of one of his child's mothers
(Exhibit ZZ: Hunting Leroux, page 505). A few pages later,
Shannon writes that Mr. Leroux has a younger sister (Exhibit
AAA: Hunting Leroux, page 508). The Mastermind, by Evan
Ratliff, another novel profiting off the government leaks, even
makes Mr. Leroux's family searchable in the index (Exhibit BBB:
The Mastermind, page 440). With such valuable information
revealed to potential retaliators, ████ ██ █ ███ ████ ███

The above examples are only a small sample of the
enormous amount of confidential material that was improperly
leaked by the government. The level of detail and accuracy,
down to the dialogue, indicates that the media had access to
sources while their recollections were fresh, discovery

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 18

material and private government documents that recorded
them, or both. Elaine Shannon certainly asserts as much
(Exhibit SS: Hunting Leroux, Note to Readers). The leaks
were so pervasive that certain incidents that were not even
documented in 3500 material were revealed in Hunting Leroux
(Exhibit CCC: Hunting Leroux, page 379). The depth and accuracy
of the government leaks reveals just how actively the
government agents pitched material to the media, and we
respectfully submit that this reckless misconduct must be
addressed through the sentencing of Mr. Leroux

        Collateral Consequences

        If Mr. Leroux were sentenced to a term of additional
imprisonment, he may be physically harmed or extorted. Two
books have been written about his criminal exploits – "The
Mastermind," by Evan Ratliff, and "Hunting Leroux," by Elaine
Shannon – and he is now well-known as a government informant and
cooperator. Like James "Whitey" Bulger who was gruesomely
murdered at USP Hazelton in 2018, Mr. Leroux is at risk. In
order to protect himself, Mr. LeRoux may be constrained to seek
segregated housing or even solitary confinement, which is
psychologically destructive. In this regard, it merits noting
that Mr. Leroux was assaulted at the MDC when his cooperation
was not known but merely suspected. He was also the repeat
victim of an attempted extortion at the GEO facility (Exhibit
DDD: Report of Leroux dated 8/30/16).

        Upon completion of his term of imprisonment, Mr. Leroux
will be removed from the United States and extradited to the
Philippines, on an outstanding warrant for smuggling firearms
from the vessel M/V Ufuk (Exhibit EEE: Affidavit of Mr. Leroux's
Filipino attorney, Robert John P. Juco, with enclosures). If
convicted of the offense, which surely he will be, he faces a
range of imprisonment of eight to twelve years. Id.

        Mr. Leroux had retained a lawyer to resolve the charges in
the Philippines and in late 2018 he was prepared to plead guilty
pursuant to a cooperation agreement. Unfortunately, his
usefulness was nullified by the release of the Ratliff and
Shannon books, which contained specific information about Mr.
Leroux's criminal conduct in, inter alia, the Philippines,

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 19

gathered by DEA agents and inappropriately leaked to the
authors.

Mr. Leroux also faces other criminal charges in the
Philippines. An attorney he consulted opined that Mr. Leroux
had no viable defense given his testimonial admissions in the
United States as to the relevant underlying facts (Exhibit FFF:
Affidavit of Bernardo v. Cabal).

Meanwhile, the Congress in the Philippines is presently
contemplating the reinstatement of the Death Penalty for the
crime of murder, with which Mr. Leroux may well be charged
(Exhibit GGG: Legal opinions regarding the death penalty and
"double jeopardy" in the Philippines, dated October 14, 2019).

Further, even at liberty, Mr. Leroux will face tremendous
risk in the Philippines. First, much of the local law
enforcement is corrupt (Exhibit HHH: press report re: PNP
officials linked to illegal drugs network; Exhibit III: press
report re: kidnapping and killing of South Korean businessman by
Filipino police officers; Exhibit JJJ: press report re: dossier
on alleged narco cops) and appears intent on harassment.



Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 20



Mr. Leroux's family is also at risk.  The Ratliff and Shannon tomes contain detailed descriptions about Mr. Leroux's personal life,



**ARGUMENT**



Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 21

## MR. LEROUX SHOULD BE SENTENCED TO TIME SERVED

Under 18 U.S.C. §3553(a)(2), the Court "shall impose a sentence sufficient, but not greater than necessary" to comply with generally recognized purposes of sentencing, including the need:

A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

B)    to afford adequate deterrence to criminal conduct;

C)    to protect the public from further crimes of the defendant; and

D)    to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Sentencing courts are also advised to consider, among other things: the nature and circumstances of the offense, the history and characteristics of the defendant and the applicable sentencing range as established by the now-advisory sentencing guidelines. 18 U.S.C. §3553(a)(1) and (4).

As set forth in the presentence report, while Mr. Leroux has never previously been arrested and is therefore in criminal history category I, with a total offense level of 43, he still faces a Guidelines term of imprisonment of life. Said term is circumscribed by statutory maximum terms on all counts but for count one of 12 Cr. 489 (RA), which would permit a life term.

The government, however, has moved for a downward departure pursuant to §5K1.1 of the guidelines and removal of the mandatory minimum term of ten years' imprisonment under count one of 12 CR 489 (RA) pursuant to 18 U.S.C. §3553(e), based on Mr. Leroux's substantial assistance, which it deemed "significant – notably so."

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 22

The government's motion is lengthy and comprehensive and I
have highlighted certain aspects of Mr. Leroux's cooperation
above, which I incorporate here by reference.  At bottom, Mr.
Leroux's cooperation was extraordinary in every relevant way.
Its significance and usefulness cannot be overstated.  See USSG
§5K1.1(a)(1).  Except for count one of 12 Cr. 489 (RA), evidence
of the remaining charges was insufficient or inchoate without
Mr. Leroux's admissions during the proffer sessions.  Further,
while he provided historical information about himself and other
cohorts, he also engaged in and underwrote various undercover
investigations, resulting in the arrests and convictions of more
than a dozen of his criminal associates, including his kill team
and narcotics partners.  He provided complete and reliable
information and his testimony both at trial and the suppression
hearing was truthful and compelling, resulting, as noted, in
convictions.  See id. at (2).  The breadth of his assistance is
unmatched by any cooperator I have known of or heard of in over
30 years in practice.  I am informed by others that he spent
more time debriefing agents than any other defendant in SDNY
history.  See id. at (3).



Further, as set forth in
the "Collateral Consequences" section above, he is likely to
suffer further criminal prosecution and extortion in the
Philippines and

Last,
his assistance was timely.  Indeed, he first proferred on the
plane from Liberia before he was even presented in the District.
See id. at (5).

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 23



The Covid-19 pandemic (which led to lockdowns, isolations and deprivations as to food, exercise and hygiene) and its continuing threat to him in imprisonment is, of course, right now paramount.

As to the nature and circumstances of the offense, I note only, as I did above, that while Mr. Leroux devolved into depraved criminality, he did not begin his crime spree corruptly.   Unfortunately, he was greedy and ambitious and once he amassed significant moneys from Rx Limited, including moneys he knew were illegally earned, he decided to expand his criminal empire (i.e., narcotics and weapons) and employ various criminal means to protect it (i.e., bribery, forgery and the staffing of a mercenary team to commit assaults, shootings, firebombings and murder).   As evidenced by his cooperation, however, it seems he has turned the corner.   In this regard, I also emphasize the reparations: voluntary forfeitures totaling $20 million and the personal funds he invested in the government's undercover investigations.

As to the Mr. Leroux's history, it helps to explain the conduct at issue and is largely mitigating.   Abandoned by his birth parents, Mr. Leroux was raised by adoptive parents, in Zimbabwe, then mired in civil war.   He witnessed atrocities in his own neighborhood on a regular basis, including torture and murder.   The family suffered from deprivations, such as the rationing of food.   He adored his mother, but his father, ███████ ████████████████████████████████████████████   He was also physically abusive and beat both his wife and Mr. Leroux.   At ten, Mr. Leroux was sent away to boarding school, ██████████████████████████████████████████████████   He hated the school.   His parents finally divorced when Mr. Leroux was 15 and he returned to his mother's

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 24

custody and day school nearby.

Nonetheless, the lack of humanity and the terror experienced during formative years – the civil war, hunger, the "war zone" neighborhood, the beatings he watched of his adored mother, the beatings he experienced, the sexual assaults and abusive teachers – shaped him.

Mr. Leroux is smart. He graduated high school and technical school. He has an IT degree and is a talented computer programmer and website designer. And, like his father, he can hold down a job. He is an earner. His employment history is laudable.

But, his relationships less so. With women, they are characterized by limited commitment, and maybe even nonchalance.



His other meaningful relationships involve his criminal empire, men he negotiated with or men he employed. The "war zone" and the school abuses prepared him for this.

Under the Parsimony Clause, a sentence of time served would be "sufficient, but not greater than necessary." Mr. Leroux has already served 92 months' imprisonment and much of it under the risk of retribution for his cooperation and difficult medical circumstances, which should be deemed punishment enough. Given his extraordinary cooperation, a sentence of time served should be understood to provide adequate deterrence to the general public. Further based on his cooperation, reparations and likely extradition to the Philippines to face additional imprisonment, new charges, or new extra-legal punishments, a time-served sentence will certainly protect the United States public from further crimes by Mr. Leroux. It is true that Mr.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 25

Leroux will continue to need medical care, but our detention and prison facilities, now, are more of a concern than a balm.

## CONCLUSION

For the foregoing reasons, Mr. Leroux should be sentenced to time-served.

Respectfully submitted,

_____ /s
James M. Branden
*Attorney(s) for defendant   Paul Calder Leroux*

Encs.