K6CALERSps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        (S2) 12-cr-489 (RA)
                                             14-cr-075 (RA)
5    PAUL CALDER LEROUX,
        a/k/a "Bernard John Bowlins,"
6       a/k/a "John Smith,"
        a/k/a "Johan Smit,"
7
                  Defendant.             Sentence
8
     ------------------------------x
9
                                         New York, N.Y.
10                                       **(via telephone)**

11                                       June 12, 2020
                                         11:30 a.m.
12

13   Before:

14              HON. RONNIE ABRAMS

15                                       District Judge

16                        APPEARANCES
17
     GEOFFREY S. BERMAN
18        United States Attorney for the
          Southern District of New York
19   BY:  MICHAEL D. LOCKARD, ESQ.
          Assistant United States Attorney
20
     LAW OFFICE OF JAMES M. BRANDEN
21        Attorneys for Defendant
     BY:  JEFFREY CHABROWE, ESQ.
22        JAMES M. BRANDEN, ESQ.

23

24

25

K6CALERSps

(Via telephone)

THE COURT:  Good morning, everyone.

We're here for United States v. Paul Calder Leroux. There are two docket numbers, docket no. 12 Crim. 489, and 14 Crim. 75.

There is a little bit of feedback on one person's line.  When you're not talking, if you can mute your line, that would be helpful.

All right.  So, first of all, this is a reminder that this is a public proceeding.  You are able to access the proceeding through the public call number.  All participants are reminded that any recording or rebroadcasting of any portion of this proceeding is strictly prohibited.

I'm still getting a lot of feedback.  Can you all hear and see me?

A VOICE:  Yes, Judge.

MR. LOCKARD:  For the government, yes, your Honor.

THE COURT:  All right.

MR. CHABROWE:  Yes, your Honor.

THE COURT:  All right.  So we're of course in the middle of the COVID-19 pandemic.  I am conducting this proceeding remotely pursuant to the authority provided by Section 15002 of the CARES Act and the standing orders issued by our chief judge pursuant to the act.  I am proceeding by video conference.  Counsel are appearing remotely also via

K6CALERSps

1  video conference, as is the defendant, Mr. Leroux, who is

2  accessing this video conference from the GEO facility.

3           Mr. Leroux, I'm going to confirm again, sir, that you

4  can see me and hear me.  Can you see me and hear me?

5           THE DEFENDANT:  I can see you and I can hear you, your

6  Honor.  I can see you.

7           THE COURT:  If at any point during this proceeding you

8  are unable to see or hear me or other participants, let me know

9  right away and we can address the problem.  OK?

10           THE DEFENDANT:  Yes.  All right, your Honor.  Thank

11  you.

12           THE COURT:  Thank you.  Also, you should know that if

13  you would like to speak privately with your attorney, you are

14  free to do so.  We will move you into a remote breakout room

15  where no one else can see you or hear you.  So you have that

16  right.  Do you understand that?

17           THE DEFENDANT:  I do, your Honor.

18           THE COURT:  So I understand from defense counsel,

19  Mr. Leroux, that you wish to waive your physical presence and

20  proceed by video conference today.  Is that correct?

21           THE DEFENDANT:  Yes, your Honor.

22           THE COURT:  And did your attorney explain to you that

23  you have a right to be present in court when you are sentenced

24  and that by --

25           THE DEFENDANT:  Yes, your Honor.

K6CALERSps

 1          THE COURT:  -- consenting to proceed by video

 2   conference you are waiving that right?  Do you understand that?

 3          Yes?  Is that right, Mr. Leroux?

 4          THE DEFENDANT:  Yes, your Honor.

 5          THE COURT:  OK.  Thank you.

 6          Can counsel please describe the process by which you

 7   discussed with Mr. Leroux his right to be present and his

 8   willing and voluntary waiver of that right.

 9          MR. CHABROWE:  Your Honor, I discussed with Mr. Leroux

10   the option of doing the sentencing remotely or doing it live in

11   a courtroom and, you know, when that potentially could be or so

12   forth and so on, and how this would be potentially different.

13   And Mr. Leroux, after a lengthy discussion, said that he wanted

14   to go forward with this, doing it by video as we're doing it

15   today.

16          THE COURT:  All right.  Thank you.

17          It looks like we lost the government momentarily, so

18   I'm going to wait until Mr. Lockard is back on.

19          THE COURT REPORTER:  Your Honor, if it's all right for

20   me to interrupt during this pause, the speaker who just spoke

21   for the defense, was that Mr. Branden or Mr. Chabrowe?  Please

22   remember I do not have a video feed, only voice.

23          MR. CHABROWE:  I'm sorry.  That was me, Mr. Chabrowe.

24   And prior to speaking next time in going forward, I will always

25   identify myself as such.  I apologize.

K6CALERSps

1        THE COURT:  Thank you.

2        THE COURT REPORTER:  Thank you.

3        THE COURT:  All right.  We have lost the government on

4    the video feed.  So we're just going to pause momentarily.

5        (Pause)

6        MR. LOCKARD:  Your Honor, can you hear me?

7        THE COURT:  Yes.  We can hear you now.

8        MR. LOCKARD:  OK.

9        THE COURT:  All right.  Thank you.

10        I find that Mr. Leroux has knowingly and voluntarily

11    waived the right to be physically present for this sentencing.

12    I also find that today's proceeding cannot be further delayed

13    without serious harm to the interest of justice.

14        This matter is on for sentencing in United States v.

15    Paul Calder Leroux.  Mr. Leroux pled guilty before Judge

16    Patterson in December 2014 to conspiracy to import and

17    distribute methamphetamine, unlicensed exportation of goods and

18    technology from the United States to a third country,

19    conspiracy to commit computer hacking, and accessory after the

20    fact.

21        In March 2016, he pled guilty before Judge Patterson

22    to conspiracy to introduce into interstate commerce misbranded

23    drugs, conspiracy to commit mail and wire fraud, and conspiracy

24    to commit money laundering.

25        So those were two different indictment numbers.  The

K6CALERSps

first three counts were from indictment no. 12 Crim. 489, or

the first four counts.  And the last three counts were part of

indictment no. 14 Crim. 75.  Those actions were reassigned to

Judge Preska after the death of Judge Patterson and then

reassigned to me on May 23rd, 2019, in light of Mr. Leroux's

testimony before me pursuant to a cooperation agreement in the

trial of Joseph Hunter, Adam Samia, and Carl David Stillwell in

case no. 13 Crim. 521, which took place in April of 2018.

          Mr. Leroux was arrested on September 26, 2012 in

Monrovia, Liberia.  On September 27, 2012, he made his initial

appearance before the Southern District of New York and was

remanded.

          In connection with today's proceeding I've reviewed

the following submissions: the revised presentence

investigation report dated May 20, 2020, which includes a

recommendation and addendum; Mr. Leroux's sentencing memorandum

dated June 5, 2020, with accompanying exhibits; as well as a

subsequent letter that I received yesterday, June 11th; the

government's sentencing memorandum dated May 28, 2020, as well

as a subsequent letter that I received on June 12th.

          I've also received various letters from the parties

with respect to redactions of the public filings.

          Have the parties received each of these submissions?

          MR. LOCKARD:  Yes, your Honor.

          MR. BRANDEN:  Yes, Judge.  Jim Branden.  Yes.

K6CALERSps

1          MR. CHABROWE:  Jeff Chabrowe also.

2          THE COURT:  And the government?

3          MR. LOCKARD:  For the government, yes, your Honor.

4   We've received those submissions.

5          THE COURT:  All right.  And am I missing anything?  Is

6   there anything else that was submitted to the Court that I have

7   not mentioned?

8          MR. BRANDEN:  Jim Branden.  No, Judge.

9          MR. CHABROWE:  Your Honor, there was a letter -- Jeff

10  Chabrowe, excuse me -- there was a letter that we submitted

11  last night from Mr. Leroux on ECF to the Court?

12         THE COURT:  That I did not receive.  So let me get

13  that now.

14         MR. CHABROWE:  OK.

15         THE COURT:  Did you file that on the docket?

16         MR. CHABROWE:  Yes, your Honor.  And I did get a

17  bounce for it.  Let me see.

18         MR. LOCKARD:  Your Honor, this is the government.

19  It's docket no. 67 in the 12 Crim. 489 docket.

20         THE COURT:  OK.

21         All right.  I'm getting out the letter.  Since I'm on

22  the court call I couldn't do it at the same time, but I just

23  accessed it and I'm reading it now.

24         All right.  I have read the letter.  Thank you.

25         So let's begin by discussing the presentence report

K6CALERSps

 1   which was prepared by the Probation Department].

 2          Mr. Branden or Mr. Chabrowe, have you reviewed the

 3   presentence report and discussed it with your client?

 4          MR. BRANDEN:  Jim Branden.  Yes, I have, Judge.

 5          THE COURT:  And do you have any objections to the

 6   presentence report?

 7          MR. BRANDEN:  No, we do not.

 8          THE COURT:  All right.  Mr. Leroux, have you reviewed

 9   the presentence report and have you had enough of an

10   opportunity to discuss it with your attorneys?

11          THE DEFENDANT:  Yes, I have, your Honor.  I have

12   reviewed the report extensively and I have discussed it with my

13   attorneys.

14          THE COURT:  Does the government have any objection to

15   the presentence report?

16          MR. LOCKARD:  This is the government.  No, your Honor,

17   we have no objections.

18          THE COURT:  The presentence report will be made a part

19   of the record in this matter and placed under seal.  I adopt

20   the factual findings in the report.  If an appeal is taken,

21   counsel on appeal may have access to the sealed report without

22   further application to the Court.

23          Mr. Leroux, when you pled guilty both in December 2014

24   and in March 2016, you discussed the federal sentencing

25   guidelines with Judge Patterson.  The guidelines are a set of

K6CALERSps

1   rules published by the United States Sentencing Commission in

2   order to guide judges when they impose sentence.  Although at

3   one time they were mandatory, meaning the judges were required

4   to follow them, they are no longer binding on judges, but

5   judges must consider them in determining an appropriate

6   sentence and must thus ensure that they have properly computed

7   the guidelines calculation.

8           I understand that the parties agree with the

9   guidelines calculated in the presentence report pursuant to

10  which Mr. Leroux is facing a guidelines range of life in

11  prison.  Is that correct?

12          MR. BRANDEN:  Yes, Judge.  Jim Branden.  Yes.

13          MR. LOCKARD:  For the government, no objections to the

14  PSR calculations.  But, your Honor, just one minor procedural

15  clarification?  Mr. Leroux pleaded guilty to the charges in

16  both informations in the same proceeding held in February of

17  2014 before Judge Patterson.

18          THE COURT:  Oh.  Thank you very much.

19          All right.  So based on the parties' agreement and my

20  independent evaluation of the sentencing guidelines, I accept

21  the guidelines calculation in the presentence report.  I find

22  that Mr. Leroux's offense level is 43, his criminal history

23  category is I, and his recommended guidelines sentence is life.

24  As I said a moment ago, that range is only advisory.  Courts

25  may impose a sentence outside of that range based on one of two

K6CALERSps

legal concepts: a departure or a variance.  A departure allows

for a sentence outside of the advisory range based on some

provision in the guidelines.  A variance, by contrast, is based

on factors set forth in a provision of the federal law.  It's

18 United States Code § 3553(a).

        I'd like to hear now from the parties.  Would the

government like to be heard with respect to the sentencing?

        MR. LOCKARD:  Yes, your Honor.  And as noted in our

sentencing submissions, at this time the government formally

moves that the defendant be sentenced pursuant to Title 18

United States Code § 3553(b) and Section 5K1.1 of the United

States Sentencing Guidelines.

        THE COURT:  That motion is granted.  Is there anything

else you'd like to say today?

        MR. LOCKARD:  Your Honor has, as the Court noted,

voluminous written materials that have been submitted in

connection with the sentencing, and has also had an opportunity

to directly observe defendant during his extensive testimony,

during the Hunter trial, and I think, in light of that volume,

perhaps the most effective way for the government to proceed

would be to perhaps answer any questions or address any issues

that the Court would like us to address.

        THE COURT:  One question I'd like you to address:  In

Mr. Leroux's letter, he says that with respect to a charge in

the Philippines, he has agreed that he will not contest

K6CALERSps

1    extradition from the U.S., will not contest a weapons

2    trafficking charge, does not contest superseding charges for

3    murder on his arrival in the Philippines, and will pay

4    restitution in the Philippines to victims' families.

5            He says that he will face a mandatory minimum of eight

6    years in prison in the Philippines and a maximum of 12 years in

7    prison.

8            Is that accurate?  One of the things that I have to do

9    here is, I have to balance a whole host of factors, and I'm

10   going to talk about them a little bit later.  But I have to

11   think about the danger that Mr. Leroux can present in the

12   future to society at large.  And if he is indeed going to be

13   incarcerated in the Philippines, that may weigh into my

14   decision.

15           MR. LOCKARD:  The short answer, your Honor, is, I do

16   not know.  I know over the course of this matter, the

17   government has had discussions over time with Mr. Leroux's

18   prior U.S. criminal defense counsel about efforts to resolve

19   potential charges in the Philippines by way of a plea,

20   including potentially a plea in absentia.  But I have been

21   advised that that's never been finalized and don't have any

22   independent knowledge about the status of that process.

23           THE COURT:  What's your understanding as to where he

24   will be extradited upon his release from incarceration in the

25   United States?

K6CALERSps

1          MR. LOCKARD:  So I say this not speaking on behalf of

2     ICE, but it's my understanding that Mr. Leroux, if he were to

3     be deported or removed, would be removed either to South Africa

4     or Australia, where he is a passport holder.  I believe there

5     is an extradition treaty between the United States and the

6     Philippines, but I don't believe there is an extradition treaty

7     between South Africa and the Philippines, and I believe there

8     is an extradition treaty between Australia and the

9     Philippines -- all of which is to say, if the Philippines were

10    to submit an extradition request to the United States and he

11    did not contest it or consented to extradition, I imagine he

12    would be extradited to the Philippines.

13          THE COURT:  All right.  Thank you.

14          And can you confirm the open case against him there?

15          MR. LOCKARD:  I am aware from discussions between U.S.

16    law enforcement and Philippines law enforcement that Mr. Leroux

17    has been the subject of ongoing Philippines law enforcement

18    interests.  I don't have any information about charges filed

19    against him and haven't received this information from the

20    Philippines Department of Justice or any prosecutor's office.

21          MR. CHABROWE:  Judge, if I may, it's our understanding

22    that the Philippines renewed their extradition request for

23    Mr. Leroux as recently as January just now, based upon their

24    following the sentencing coming soon in this case, and that

25    that request for extradition was just renewed in January of

K6CALERSps

1    2020.

2                  THE COURT:  All right.  Thank you.

3                  Mr. Lockard, would any victims like to be heard today?

4                  MR. LOCKARD:  Your Honor, not that I'm aware of.

5    Notifications were made through law enforcement channels to law

6    enforcement in the United Kingdom and in the Philippines, and

7    we were staying in contact with any victims if they wished to

8    be heard, and I have not been advised that any victims have so

9    indicated.

10                  THE COURT:  All right.  Thank you.

11                  Would defense counsel like to be heard?

12                  MR. CHABROWE:  Yes, your Honor.  I think -- I would

13    like to be heard briefly.  I was going to go first.  I'm sorry.

14    Jeff Chabrowe for Mr. Leroux.  I was going to speak first.  I

15    believed that Mr. Branden would be speaking after me.  I am

16    going to be discussing the leaks briefly.  I know that this is

17    something that we've submitted voluminous material to the Court

18    and we've discussed it quite a bit.

19                  A couple of points that were not made in our

20    submissions, your Honor.  There are a number of podcasts

21    actually that exist online, most recently one from 2019, with

22    Elaine Shannon, who is the author of the book *Hunting Leroux*,

23    Tommy Cindric, one of the former DEA agents, and Lou Milione,

24    who was the agent and the head of the 960 unit, discussing the

25    book, also discussing a movie that will be forthcoming about

K6CALERSps

1  the book.  In this interview, your Honor, Lou Milione says

2  that, talking to Elaine Shannon, they gave her information

3  about the investigation in Mr. Leroux that they wouldn't have

4  given to anyone else because they trusted her.  He says

5  specifically, quote/unquote, we have the clearance to be able

6  to speak to her and it wouldn't have been with anybody else,

7  although it's our understanding that Ms. Shannon did certainly

8  share a lot of this information as well.

9           Our understanding, your Honor, is that there actually

10  is a movie being made about -- that's already in

11  preproduction -- about *Hunting Leroux*, being made, produced by

12  Michael Mann.  And Lou Milione from the DEA, who used to be an

13  actor prior to being an DEA agent, is actually going to be

14  playing himself in the movie.

15           Another issue, your Honor, is that a lot of the

16  discovery from this case was actually uploaded to YouTube,

17  including details about Mr. Leroux's family, descriptions of

18  the family.  There's a clip of him sitting at a computer -- it

19  says "DEA surveillance" on it -- to sort of use as somewhat of,

20  I guess, a teaser for the book.

21           A number of description from the book, your Honor --

22  and these are all thing that could not have been obtained by

23  Ms. Shannon unless she had been told this information, that

24  she'd gotten any sort of confidential information.  There's a

25  description of, specifically in the book, page 99, Mr. Leroux's

K6CALERSps

children, different women that he's been with, who are the
mothers of each children.  Page 289, there's a confidential
source recording in a hotel shortly before Mr. Leroux is
arrested, a description of a child of his as an infant who they
described as a beady-eyed baby.  There is a description from
when Mr. Leroux's hotel room was bugged, a recording of he and
his wife having sex and things that are said during that time.
In the book there is a description of DEA Agent Tommy Cindric's
personal discussion with Mr. Leroux.  This is just the two of
them talking about how many children he had and who were the
mothers of those children.  And then another conversation that
takes place about Mr. Leroux's abuse that he suffered from his
father, how that affected him.

These are all things that are very, very personal
about his family or just about him, about his children, about
his wives, that were all released by the DEA to Elaine Shannon
for writing the book.  There is a recorded conversation between
a confidential informant and an undercover about the sale of
methamphetamine.

And then I think most disturbing, your Honor, there is
a very, very detailed descriptive discussion in the book, on
page 365 of what I'm looking at, of one of the first proffers
with Mr. Leroux in Brooklyn, describes exactly who is at the
proffer, and Mr. Lockard.  And actually I think it's the first
proffer.  There are supervisors present.  Everybody is present.

K6CALERSps

It describes what a proffer is.  And towards -- I believe this
is where there is the first discussion of the signing of a
cooperation agreement.

          And I'm reading from the notes actually right now of
Ms. Shannon's book.  It states, "Leroux's admissions for his
plea bargain are contained in the proposed cooperation
agreement for Paul Leroux, drafted by the attorneys in the
office of the U.S. Attorney for the Southern District of New
York," and then it names a number of U.S. Attorneys who signed
off on this.

          And then this is what is most troubling:
quote/unquote -- this was not made part of the public court
record but was obtained by the author.  This is on page 527 of
the paperback.  It's very clear, your Honor, that this is then
the proposed plea agreement.  And we had submitted something to
the Court yesterday in camera to look at this.  It's very clear
that the proposed plea agreement, which contains 3500 material,
as well as, I think, notes from proffers, was given to
Ms. Shannon.  We would assume it was done so by the DEA.  This
was signed on February 4th of 2013.  Once again, she clearly
states it was not made part of the public record but was
obtained by the author.

          There is a description in the book, page 379, of, I
believe it's Tommy Cindric, questioning Mr. Leroux.  "You're
not being totally honest.  You have to tell us about the

K6CALERSps

murders, tell us about the murders." Not only is this not even
in a proffer; it's actually in a hallway outside, nothing
that -- this goes way beyond anything that would have been in a
proffer or in 3500 material.

There are descriptions in the book about Mr. Leroux
setting up an FTP server for Iranian officials to access
weapons plans that he uploaded without directly implicating
themselves of a designed explosive, which is called PETN, which
Ms. Shannon repeatedly calls "the coffee sweetener bomb."

These are things, your Honor, that were never in trial
testimony, not something Ms. Shannon could have known unless it
had been leaked to her.

Yesterday, in a submission in the afternoon, the
government finally admitted, after years really, that the DEA
agents here leaked info from the case, referring to the leaks
as regrettable and unfortunate. However, what struck me, your
Honor, one of the most revealing things of this submission is a
footnote. On page 4 -- this is from yesterday afternoon --
where the government states, "The government did not discuss
the case with the book's author and did not review the
information provided by the DEA."

So this is sort of buried in the government's
submission yesterday, where they're saying that they did not
know, they don't know what the DEA gave to the author. It was
not reviewed by them. And I think it's very clear that they

K6CALERSps

1    had no idea what was provided or how much.

2            The government's submission yesterday when they're

3    finally acknowledging the leaks is at times contradictory in

4    and of itself.  And they're repeatedly saying that there were

5    leaks but all of the information, a lot of the information came

6    based upon public interest in the case.

7            The government also seems to be justifying the leaks

8    and saying that there was a great, deep degree of public

9    interest.  They specifically say that Agents Cindric and

10   Milione spoke to Ms. Shannon with the express approval of the

11   DEA, and this was done based upon public interest and the

12   significance of the case -- seemingly saying that if the DEA

13   makes a determination that a case is of significant public

14   interest and significance, they can then make their own

15   determination, regardless, I guess, of the U.S. Attorney's

16   Office involved at that point, to speak to the press or anyone

17   else based upon that.

18           I think, your Honor, this doesn't make sense.  I think

19   that any case with that amount of public interest, where the

20   government or certainly the DEA should be acting with more

21   discretion, not less, perhaps there should be some situations,

22   especially when you're talking about things like 3500 material

23   and proffer notes, it's up to the government to make any sort

24   of disclosures to the press.  Leaving that in the hands of DEA

25   is not at all appropriate, especially when we're talking about

K6CALERSps

cooperation and confidential information.  Not only is

justifying this as public interest incorrect and putting

Mr. Leroux at risk, but I think that it also creates a very

dangerous precedent in that it's going to chill or deter people

from cooperating in the future, particularly in high-interest

cases, where you're saying that, if there's a lot of interest

in the case, it's OK for the DEA to be leaking things to the

press.  Not only could this cause, I think, a chill on

cooperation in the future, but it also creates a situation

where it's encouraging DEA agents to not only leak to the press

in cases they determine to be those of public interest, but

even more dangerously, perhaps even looking for cases that are

deemed to be of great public interest so they can then do what

Mr. Cindric and Mr. Milione did and sell their story to authors

or to movie producers.  And that's very clearly what happened

here.

        The government states in their letter yesterday that

the DEA expressly approved them speaking to Ms. Shannon, but I

would imagine that the DEA did not expressly approve Agents

Cindric and Milione to then quit and sell their story.  And I'm

sure that they received money for this.  As I stated, there is

now being a movie made with Mr. Milione actually playing

himself in the movie.

        The government also repeatedly states in their

submission yesterday that the amount of information that is out

K6CALERSps

there as to Mr. Leroux, including that about his family, is
because of the public interest in this case.  They have it
backwards.  The leaks are what started the public interest in
this case.  The leaks in this case go back until December 2013.
And that's what actually started, I think, really, started the
amount of interest in this case, from the leaks.  Essentially
it was marketing for a book that was going to be coming out.
In doing so, this was violating multiple protective orders that
have been issued by this court.  And I think there's a
reference actually to an article, the government makes
reference to an article called -- that referred to Mr. Leroux
as "the criminal mastermind you never heard of."  And I think
that that's absolutely true, because no one had ever heard of
Mr. Leroux.  He wasn't, you know, someone like Pablo Escobar or
something like that, that -- at the time of his arrest, no one
knew who he was, and it was the leaks that led to him being
known.  And that's what led to the public interest in him, as
opposed to public interest causing the information to be leaked
by the government.

        There was a number of evidence, different examples I
gave, where it's very clear that there are leaks made to
Ms. Shannon.  Our sentencing memorandum repeatedly talks about
that this is not what was in trial testimony, as the government
stated, although it seems to be now retreating from that
position.  Not once has the government been able to point out a

K6CALERSps

single example of any of the leaks that we've said where they

said no, this is the source of that.  Instead, they just sort

of vaguely refer to, oh, well, there's a lot of public

interest, there's a lot of press attention.  Every single

example that we gave is something that Ms. Shannon could not

have known about unless she got it -- they've never been able

to point out another source of this information.

I believe --

THE COURT:  Let me just ask you a question,

Mr. Chabrowe.  Even if everything you say is true, we're here

for a sentencing of a very violent criminal.  Other than the

physical harm that these alleged leaks may have caused

Mr. Leroux or his -- or potential harm it may have caused

Mr. Leroux or his family, how should I factor this in at

sentencing today, in your view?

MR. CHABROWE:  Well, obviously, your Honor, you know,

5K1 states that the risk that Mr. Leroux faces or that his

family faces are very much factors that your Honor should

consider when fashioning a downward departure.

THE COURT:  And I was going to factor those in anyway

of course.

MR. CHABROWE:  OK.  And I apologize for being -- I was

just getting to that point.  But I think that the risk that he

and his family face are quite substantial.  Melanie, who is the

mother of one of Mr. Leroux's children, was abducted and held

K6CALERSps

for ransom in the Philippines.  There were other home invasions

in the Philippines.  There were police reports for all of these

things were submitted to the Court in our sentencing

memorandum.

         I think that there is also a lot of information that

Mr. Leroux gave that's in the book that was not disclosed

otherwise, that was not at trial, where Mr. Leroux is talking

about corruption in the Philippines particularly.  And he is,

as your Honor mentioned earlier in the sentencing, Mr. Leroux

is now going to be going to the Philippines.  This is now when

he's going to be most at risk, going where I think that they

certainly have an ax to grind against them.  He's going to be

going there and held.  He's going to be charged with murder and

weapons trafficking.  And he's going to be very much at risk

not just being in the Philippines, your Honor, but being in a

jail system where it's much easier for them to get at him and

in a jail system that, you know, this is not like being here,

at GEO, certainly not anywhere here, where people are much more

at risk from corrupt prison officials or organized crime.

         I think that one example, your Honor, and when we're

talking about what could happen to Mr. Leroux once he's there,

beyond the risk to him and his family, that his co-defendant on

the case, one of his co-defendants on the drug case that he had

in the Philippines, Brian Hill, was sentenced to life already

in the Philippines.  There is an arresting officer in that

1  case, Leonardo Swann, who was also the arresting officer in

2  another case of a South Korean businessman named Jee Ick-joo.

3  And this is something that happened recently in the Philippines

4  where this man was arrested, there were repeated, repeated

5  efforts to extort him for money, that he was tortured while in

6  custody.  And while I think his wife was actually present,

7  there were efforts made where there was some money turned over,

8  and while Philippine officials were trying to extort him for

9  more money and torturing him, they accidentally killed him.

10  This is a case that has gotten some press attention, as stated.

11  The arresting officer on the case for Mr. Hill, who is

12  Mr. Leroux's co-defendant, is one of the same officers who was

13  involved in this.  And this is unfortunately what Mr. Leroux is

14  going to be dealing with going forward.

15       So I think that, I think your Honor could certainly

16  integrate this by considering alternatively deterrence of

17  future conduct by law enforcement, encourage responsibility and

18  accountability going forward.

19       But I think that the risks that Mr. Leroux and his

20  family are facing are not only significant, but are perhaps,

21  just now the real risks to Mr. Leroux are just now starting

22  from the fact that he is certainly going to be extradited to

23  the Philippines.  And I think that -- I know that there are

24  many, I'm sure that there are many people in the Philippines

25  base upon what we have submitted -- I know there is some other

K6CALERSps

1  stuff Mr. Branden has talked about -- who, Mr. Leroux has a lot

2  of enemies there.  And I think that the release of the

3  information by Ms. Shannon has certainly exacerbated that

4  situation.

5          THE COURT:  All right.  Thank you.

6          Mr. Branden, is there anything you would like to add?

7          MR. BRANDEN:  Yes, Judge.  Thank you.

8          Like the government noted, we have written a great

9  deal about Mr. Leroux in these sentencing submission.  For a

10  cooperator I don't normally write at such length, but this is

11  an outside case on so many different levels.  The number of

12  crimes that are detailed in the presentence report require

13  attention.  But on the other hand, so does the extraordinary

14  cooperation that this defendant provided.  I think that in the

15  government's letter from yesterday, they admitted that there is

16  really no precedence for this amount of cooperation.  Part of

17  that of course is because of the degree of the criminality.

18  But he has probably proffered more than anybody else in the

19  Southern District ever.  He gives assistance to the

20  government --

21          THE COURT:  I don't know where that figure came from,

22  by the way.

23          MR. BRANDEN:  I don't know.  Somebody told me that and

24  I threw it down in the submissions expecting maybe there would

25  a challenge, and there wasn't.  So I'm not asking the Court to

K6CALERSps

1    take it as the gospel truth.  But I would have expected that

2    the government would say, no, that's not true, if they believed

3    it to be untrue.  At the very least, the cooperation and

4    proffering was extensive.

5         So I'm not going to go through all of the 5K1 factors.

6    But certainly the cooperation has been extraordinary.  As a

7    result of his extensive cooperation, he's also spent eight

8    years in detention.  Generally serving time in detention is far

9    worse than serving time in BOP custody.  And I think that's

10   true here.  But in addition he's also been the subject of an

11   assault.  He was the subject of extortionate press.  He's had

12   serious health issues while he's been in.  And I suggest that

13   this eight years was worth more than just eight years.

14        And as Mr. Chabrowe noted, I think that there will be

15   severe collateral consequences for him when he's returned to

16   the Philippines, not just legally, perhaps extrajudicially, but

17   also the security agencies and the mercenaries out there that

18   are looking to target him anew pose a very, very serious threat

19   to him.

20        And I just want to note finally that the government's

21   letter from yesterday answers your Honor's question about

22   whether this particular defendant is a threat to anybody at the

23   moment.  And while the government couldn't rule that out, under

24   no circumstances, I think that it's a fair assessment of what

25   they're saying to you is, no, he is not a threat to anyone at

K6CALERSps

1    this present time.

2            So without getting, you know, reviewing everything

3    I've already said in writing, he's served nearly eight years in

4    prison already, eight years in detention already.  Especially

5    given what he's facing in the Philippines, in which he will

6    almost surely face another decade of imprisonment, he should be

7    sentenced to a term of time served.

8            THE COURT:  Thank you.

9            Mr. Lockard, was your position in that letter that he

10    doesn't pose a danger to the community, or just that there are

11    no particular individuals at this point in time that you know

12    he presents a danger to?

13            MR. LOCKARD:  Your Honor, it was the latter.  We're

14    not aware that he poses a danger to any particular person or

15    persons upon his release.  And I think we walk the Court

16    through sort of our analysis of whether or not he poses a risk

17    of danger to the community, essentially through the risk of

18    recidivism.

19            THE COURT:  And that he does continue to pose such a

20    risk.

21            MR. LOCKARD:  I think you have to say -- well, since I

22    can't say no, he poses no risk, then I have to say yes, he

23    poses some degree of risk.  That risk is difficult to quantify.

24    But I think it certainly is -- his past gives a reason to

25    believe that there's a risk, the incident involving Mr. Islam,

K6CALERSps

1   we think reasonably there is a risk.  And, you know, frankly,

2   the letter that was filed yesterday outlining Mr. Leroux's

3   intention to go into the bitcoin mining business points to the

4   possibility of such a risk.  And that is not to say that there

5   is anything illegal about operating a bitcoin mining business.

6   Those kinds of businesses can be operated in a perfectly legal

7   manner.  But it's also true that, you know, cryptocurrency is a

8   hot topic among law enforcement in terms of things like money-

9   laundering risks, sanctions evasion, and counter-

10   terrorism-finance risk.  And, you know, it is, I would say it's

11   not a comfort to know that that's Mr. Leroux's plan.

12        THE COURT:  You also noted in your latest letter that

13   his sentencing advocacy to date reflects little if any remorse,

14   rehabilitation, or acceptance of responsibility beyond that

15   required by guideline provision 3E1.1.

16        MR. LOCKARD:  Yes, your Honor.

17        THE COURT:  All right.

18        Mr. Leroux, would you like to be heard at all?  I read

19   your letter, but I'm happy to hear anything you'd like to say

20   today.

21        THE DEFENDANT:  I would, your Honor.  I would.

22        I would just like to thank the Court for offering me

23   the opportunity to speak, your Honor.  And also I'd like to

24   apologize to the Court for my acts and conduct in this case.  I

25   really have no words to describe my conduct.  I'd like to

K6CALERSps

apologize to the victims' families.  All I can say, your Honor,

is, I have no excuses.  I have been diagnosed with mental

health issues.  I've been diagnosed at GEO.  I saw the

psychologist in 2013.  I started mental health treatment.  I

was diagnosed with anxiety, depression, post-traumatic stress

disorder, and a personality disorder.  And I saw the

psychologist and I tried to treat myself.  The PSR says I

didn't undertake any treatment.  That is not true.  I did

counseling with the psychologist.  I can't take medications

because I have liver damage.  But I did do counseling.

        Also, your Honor, I'd like to say that it was the

tremendous hyperbole of the media and the hyperboles that I

have no feelings and I have no remorse.  But that's not true,

your Honor.  I stay awake at night.  I sleep one or two hours.

And I told the prosecutor that during prep for the trial, when

I testified in front of you.  I sleep one, two hours.  I think

about my terrible crimes all the time.  I just don't understand

what happened.

        I would like to tell you something about my family,

too, your Honor.  I spoke last week to my eight-year-old son.

He told me, "Dad, I've never seen you in my whole life.  When

are you coming home?"  And I understand, it broke my heart, I

understand how the victims' families must feel.  I can only

apologize over and over again.  So many of these people will

not have any more chance to reunite with their family members.

K6CALERSps

1              What I have done, your Honor, is, I've cooperated in

2       the federal case.  I submitted to your Honor, to the Court, the

3       original arrest warrant for the weapons-trafficking conduct,

4       and that includes relevant conduct, at least one of the murders

5       that occurred in Philippines.  That was dated in 2000 and

6       actually predates the instant case.  That was updated by the

7       Filipino government in January of 2020.  And the reason for

8       that is, they have worked on and submitted an extradition, as I

9       understand it, although presumably things have slowed down

10      because of the COVID-19 pandemic that's no doubt slowed things

11      down as well as it has slowed things down here in the United

12      States.

13              So what I've been saying is, I haven't cooperated

14      there.  The USA will extradite me.  There are outstanding

15      arrest warrants in the Philippines.  And I have agreed I will

16      pay restitution, and that's the first thing I plan to do.  For

17      family members that I destroyed and for the families that have

18      suffered I'll pay restitution immediately.

19              My own family, as it happens, relies on me on a daily

20      basis for money.  Nobody else has helped them in the

21      Philippines.  Most of them are in hiding and afraid for their

22      lives.  The leaks have been absolutely devastating, not in

23      respect so much to myself but with respect to their safety.

24      They said they effectively have death sentences on their heads,

25      your Honor.  The Philippines is a dangerous country.  Criminal

K6CALERSps

groups and the police are involved in kidnapping and murder in the Philippines on a wholesale basis.  I can't say enough about the danger to my family, because I just can't put it into words.

        I refer you to the first promotional portion of the campaign in the Philippines in 2013.  And I refer you to the first home invasion in 2015.  The dangers in the Philippines are immense.  My co-defendant, Mr. Brian Hill, in his trial testimony he stated he was extorted by the police in prison and he still received a life sentence.  Also there was the example mentioned earlier by Mr. Chabrowe, I believe, about a South Korean businessman arrested and killed by the police.  He was arrested by the same arresting officer as arrested --(unintelligible).

        In the government sentencing submission, that said that I met the government in February, on or about February 2020, and I said that my family was OK.  This is because I had nothing more to add, your Honor.  I had already submitted a witness protection request for some of my family members, which was actually denied on that day.  And the problem with my family is, your Honor, is, they're not even cooperating with me, never mind the government.  They're not cooperating because they believe any information they will provide will be leaked immediately, rightly or wrongly.  And that is the situation.  I can't get documentation from them.  They don't want to send

K6CALERSps

1   anything to me for sentencing.  I had to beg to get all the

2   documents from them relating to the kidnapping incident,

3   relating to the home invasions, and relating to the fact that

4   they have been followed, extorted, arrests.  There's been

5   vandalisms of my, my properties.

6        I expect that I should suffer, your Honor.  I should

7   be punished.  But my family have done nothing wrong.  They have

8   not done anything, not committed any crimes, and effectively

9   all the leaks in this case have put a very big mark on the back

10  of their, of their heads.  It's just a miracle, your Honor,

11  nobody has been killed yet in this case.

12       I hope and I pray that the Court will take into

13  account the fact that I was arrested on a nonviolent drug

14  offense.  Apart from the example in the case in Count One, the

15  drugs involved are all in -- (unintelligible).  I would have, I

16  would have to say, if I had just stayed quiet, it's likely that

17  my plea would have been 25 to 30 years.  It's up to the

18  government and up to the Court what my eventual sentence would

19  have been, but I understand that the government said that there

20  wasn't enough information to charge me with any single act of

21  violence.  All the information, almost all the information in

22  the PSR and almost all the information in the --

23  (unintelligible) -- against me came from me.  If I had just

24  stayed quiet, I likely would have been sentenced like a

25  one-time drug offender.  And that is the wrong thing to do.  In

K6CALERSps

this situation, I need to bring closure. I don't want to run

from the crimes that I've committed. I want to do my time in

the U.S. Whatever your sentence is today, your Honor, I want

to do that time and I want to do the time and should --

(unintelligible) -- because I caused damage to victims' family

and they deserve closure. The government has repeatedly said

that the government wants justice for Catherine Lee. However,

your Honor, it's not possible for Catherine Lee to have a full

measure of justice here in the U.S. for the simple reason that

most of the co-conspirators are in the Philippines and are not

subject to U.S. jurisdiction in respect to them. So the only

way for me to have a full measure of justice is for me to be

returned to the Philippines for the arrest warrants that exist

as well as the superseding indictment for multiple murders

which occurred in the Philippines, and for me to cooperate and

bring into the system all the co-conspirators in the

Philippines that I conspired with in that time. I'm the most

culpable person and I'm the person in the best position to

bring those people in and make sure they face justice. And I

would have no objection to the government removing me to the

Philippines, because none of them can very easily verify that

the charges in the Philippines exist and are valid.

          Now, in respect to the bitcoin mining, bitcoin mining

relates to the fact, your Honor, that I have an electronics

background. I need to follow the line of work that aligns with

my skill set.  I have a programming background.  I have an

electronics background.  I can't sit here and tell the Court

that I'm going to do something which does not align with my

background.  So the bitcoin mining, yes, if I understand, there

are criminals involved in that business, as there are criminals

involved in everything.  But I intend to follow the laws.  I

intend to follow the regulations.  I intend to approach that

business correctly.

         And I really have no explanation what happened to this

case, no excuse for my actions.  And my actions are

unforgivable.  And, again, I would like to apologize to the

Court, to the victims' families.

         And that's all I have to say, your Honor.  Thank you

for your time.

         THE COURT:  Thank you, Mr. Leroux.

         Mr. Lockard, is there anything you want to say with

respect to what information you had about these acts of

violence before Mr. Leroux began to assist the government?

         MR. LOCKARD:  Sure, your Honor.  And I think this will

also address in part some of the arguments that Mr. Chabrowe

made.  One of the important pieces of information about

Mr. Leroux that was already publicly available prior to his

arrest is the fact that he was discussed in a U.N. report about

instability and drug trafficking in Somalia, as a result of his

attempts to establish, you know, essentially a paramilitary

K6CALERSps

1    base in that country for weapons and drug trafficking.  And

2    that is a publicly available document that the U.N. published

3    in 2011.

4           So I don't think that Mr. Leroux would have been

5    treated as a run-of-the-mill narcotics defendant had the case

6    been resolved solely on the basis of the initial indictment.

7    The murders of several of the individuals in the Philippines

8    was the subject of public reporting.  And U.S. law enforcement

9    certainly was aware of indications that Mr. Leroux was involved

10   in or had directed some of those murders.  The information

11   wasn't sufficient to charge.  And, you know, there is not --

12   there was not an apparent U.S. jurisdictional basis to those

13   murders at the time.  But I think it's a bit of a stretch to

14   say that that information could not have been developed for

15   sentencing purposes.

16          So I think Mr. Leroux faced serious charges.  I think

17   that that is, you know, why he made the decision to cooperate,

18   because he knew about the seriousness of the charges that he

19   faced.  And he did cooperate.  And he lived up to his

20   cooperation obligations.

21          But to directly answer the Court's question, no,

22   Mr. Leroux would not have been treated as an ordinary drug

23   defendant.

24          THE COURT:  Is there any reason that sentence cannot

25   be imposed at this time?  Does anyone else want to be heard

K6CALERSps

1    further?

2            MR. CHABROWE:  Jeff Chabrowe for Mr. Leroux.  No

3    reason, no, your Honor, no.

4            MR. BRANDEN:  Jim Branden.  No reason, your Honor.

5            THE COURT:  Thank you.

6            I am required to consider the advisory guidelines

7    range of life in prison as well as various other factors that

8    are set forth in a provision of the federal law.  It's 18

9    United States Code § 3553(a).  And I have done so.  Those

10   factors include but are not limited to the nature and

11   circumstances of the offense and the personal history and

12   characteristics of the defendant, because every defendant must

13   be considered individually as a person.  Judges are also

14   required to consider the need for the sentence imposed to

15   reflect the seriousness of the offense, promote respect for the

16   law, provide just punishment for the offense, afford adequate

17   deterrence to criminal conduct, protect the public from future

18   crimes of the defendant, and avoid unwarranted sentencing

19   disparities, among other things.

20           Let me put that -- and, Mr. Lockard, if you can turn

21   your computer on mute, please.  I think there's a little

22   feedback.

23           MR. LOCKARD:  I apologize, your Honor.

24           THE COURT:  Let me put that in nonlegal terms.  Most

25   judges agree that the hardest thing we do in our jobs is to

K6CALERSps

sentence people.  It is indescribably difficult for a human

being to judge another human being, decide if they should be

deprived of their freedom, and if so for how long.  Each

sentence is difficult -- although, in all candor, some

sentences are more difficult than others.  This sentencing is

especially difficult for an unusual reason.  And that is

because there is no question in my mind that Paul Calder Leroux

deserves to spend the rest of his life in prison.  And I don't

say that lightly.  Indeed, the only people I have sentenced to

prison for life in my time on the bench are three members of

Mr. Leroux's own mercenary crew: Joseph Hunter, Adam Samia, and

Carl David Stillwell, all of whom faced mandatory life

sentences after being convicted of the murder for hire at

trial, the murder of Catherine Lee, a murder ordered by

Mr. Leroux.

Most criminal defendants have prior kindnesses or

charitable deeds that they highlight to the Court.  They show

genuine remorse, efforts at rehabilitation, or they at least

try and persuade me that they are no longer a danger to

society.  Not so here, not really.  I mean, today was the first

day I have heard Mr. Leroux express any remorse.

While Mr. Leroux has only been charged and pled guilty

to nonviolent crimes, those crimes alone provide for a

guidelines sentence of life in prison.  But they don't tell

half the story, as jurisdiction was lacking, and evidence in

K6CALERSps

some respects, with respect to much of what he has done in his
life.  Indeed, the scope and severity of Mr. Leroux's criminal
conduct is nothing short of breathtaking.  He agreed in his
plea agreement that all of it can be considered relevant
conduct at sentencing.

I have before me a man who has engaged in conduct in
keeping with the villain in a James Bond movie.  He operated a
mercenary team that committed beatings, shootings, and
firebombs.  He participated in the murder for hire of at least
seven people.

And let's just pause there for a minute.  There are
seven people -- Herbert Chu, David Smith, Chito, Naomi Edillor,
Catherine Lee, Joe Frank Zuñiga, and Bruce Jones -- whose loved
ones will never see them, hold them, or speak to them again.
In the case of Catherine Lee, she was shot in the face and her
lifeless body was left on a pile of garbage.  Others were shot
and their bodies anchored to boats and sunk in the water.  The
bodies of others still have not yet been found.

Mr. Leroux trafficked in illegal pharmaceuticals:
methamphetamine and cocaine.  He smuggled gold, chemicals, and
weapons on several continents.  He ran a weapons research and
development program for the Iranian government.  He attempted
to acquire surface-to-air missiles.  He laundered funds from a
pharmaceutical company.  He planned a coup in the Seychelles.
And he bribed government officials in the Philippines, China,

K6CALERSps

Laos, Africa, and Brazil.  If Paul Calder Leroux had a

situation that he could bribe or kill his way out of, he did

so.

          So why is this sentencing difficult?  Why shouldn't he

just get a life sentence like Hunter, Samia, and Stillwell did?

Because Mr. Leroux also cooperated with the government.  He did

so for years.  And he put himself and his family at serious

risk of harm.  Although he initially attempted to bribe

Liberian law enforcement in order to escape apprehension, once

that effort proved unsuccessful and he was placed on an

airplane to this district, he began the process of cooperating

with the government.  And while he failed to mention his

involvement in murders and violence at first, he ultimately did

and provided voluminous, detailed, and heavily corroborated

information.  He actively engaged in communications with

various associates in furtherance of ongoing investigations,

and introduced them to DEA confidential informants.  He

testified in a hearing in Minnesota and before me at the trial

of Hunter, Samia, and Stillwell.

          Mr. Leroux's cooperation led to the dismantling of his

mercenary organization, the arrests and prosecution of over a

dozen of his criminal associates, the seizure of kilograms of

methamphetamine in the Philippines, and the use of critical

physical evidence, including the van used during Catherine

Lee's murder.

K6CALERSps

1          If judges don't give cooperating witnesses a

2     significant benefit at sentencing, the criminal justice system

3     will suffer, fewer people will cooperate, and the government

4     will be unable to make important cases like those involving the

5     murder of Catherine Lee.  Cooperation is integral to the

6     system.

7          The question then becomes, how much of a benefit

8     should Mr. Leroux get for his cooperation?  How do I balance

9     that interest with the other interests I mentioned earlier,

10    including public safety, deterrence, just punishment, and the

11    need to avoid unwarranted sentencing disparities?  To help

12    answer that question, I asked the parties to suggest cases they

13    believed were analogous.  The government was unable to provide

14    a readily comparable case due to the sheer scope of

15    Mr. Leroux's criminal conduct.  Mr. Leroux urged me to consider

16    the sentencing of Yi Tiong Tan Lim, who was a criminal kingpin

17    in the Hong Kong Triad organization.  He received a sentence of

18    138 months after he attempted to cooperate, but he was never

19    signed up as a cooperating witness.  But Lim does not appear to

20    have engaged if any acts of violence.  So that example is

21    inapposite.

22          Just yesterday, his counsel also cited to two other

23    cases purportedly involving heinous acts of violence.  But

24    since those materials were under seal, none of us were able to

25    review them.

K6CALERSps

1          In any event, every sentencing is different.  Every

2     defendant is unique.  This sentencing is especially so.  This

3     defendant testified before me about how he used 200 armed men

4     in the hopes of becoming a warlord in Somalia, using, quote,

5     whatever violence was necessary.  That says a lot about who he

6     is as a person.  He wasn't just a mercenary.  But he had his

7     own mercenary team, shooting some people, including a former

8     associate, himself, and ordering the murder of numerous others.

9     Some murders were ordered simply out of paranoia.  Not only did

10    he smuggle gold and bribe countless foreign officials, but he

11    sought to purchase not only a submarine but missile technology

12    from North Korea so as to reverse-engineer it and sell it to

13    Iran.

14         This is no ordinary defendant and no ordinary

15    cooperating witness, particularly given the lack of genuine

16    remorse, again, that I have felt up to this point in time.  I

17    heard remorse expressed today for the first time.  Or efforts

18    at rehabilitation other than his cooperation.  In my view and

19    in the view of the Probation Department, and in the view of the

20    government, he still presents a danger to society.  Indeed, I

21    believe he continues to present a grave danger to society.

22         Finally, I've considered all the other arguments

23    Mr. Leroux has made in addition to his assistance with the

24    government, including but not limited to the difficult aspects

25    of his childhood in war-torn Zimbabwe and other war-related

K6CALERSps

1    traumas.  I've considered his health issues.  I've considered

2    the case in the Philippines and the fact that he may face

3    additional time there.  I've considered the harm he and his

4    family have faced as a result of the alleged improper leaks to

5    the press, as well as his cooperation more generally.

6        So ultimately I have to balance all the information I

7    have before me, the breadth of Mr. Leroux's conduct, what that

8    conduct says about him as a person, which I think is a strong

9    indicator of what someone is likely to do in the future, the

10    grievous harm he caused, the extent of his cooperation, and

11    everything else in the record, and I have to come up with a

12    sentence that is sufficient but no greater than necessary.

13        In the Court's view, he must get a real, significant

14    benefit, less than the life sentence recommended by the

15    guidelines.  But the sentence must also be sufficiently serious

16    so as to deter him from returning to a life of senseless crime

17    and to protect the public.  I am ready to do so.

18        Mr. Leroux, it is the judgment of this Court that you

19    be committed to the custody of the Bureau of Prisons for a term

20    of 25 years.  I'm going to read the breakdown of that sentence.

21    You are to receive a sentence of 300 months on Count One of

22    indictment 12 Crim. 489, 240 months on each of Count Two of 12

23    Crim. 489 and Counts Two and Three of 14 Crim. 75, 180 months

24    on Count Four of 12 Crim. 489, and 60 months on each of Count

25    Three of 12 Crim. 489 and Counts Two and Three of 14 Crim. 75,

K6CALERSps

1    all to run concurrently.  So it's a total of 300 months'

2    imprisonment on all counts.

3            With respect to supervised release, you'll receive a

4    term of supervised release of life on Count One of 12 Crim.

5    489, three years on each of Counts Two through Four of 12 Crim.

6    489 and Counts One through Three of 14 Crim. 75, to run

7    concurrently, for a total of a life term of supervised release.

8            I recognize of course that you will be expect to be

9    deported prior to that.

10           I also note for the record that Mr. Leroux has already

11    served 92 months of that sentence.

12           I will also note that this is by far the longest

13    sentence that I have imposed on a cooperating witness, but for

14    the reasons I stated above, I firmly believe it to be necessary

15    for this very unique case.

16           With respect to supervised release, all the standard

17    conditions of supervised release shall apply.  Counsel, would

18    you like me to read those conditions out loud, or is that not

19    necessary?

20           MR. CHABROWE:  That's not.  Jeff Chabrowe for

21    Mr. Leroux.  I don't believe that that's necessary, your Honor.

22           THE COURT:  I am going to read the mandatory terms of

23    supervised release:

24           You may not commit another federal, state, or local

25    crime.  You must not unlawfully possess a controlled substance.

K6CALERSps

1    You must refrain from any unlawful use of a controlled

2    substance.  You must submit to one drug test within 15 days of

3    release from imprisonment and at least two periodic drug tests

4    thereafter as determined by the Court.

5           I'm actually going to, at the recommendation of the

6    Probation Department, I'm going to suspend the drug testing

7    condition.

8           You must cooperate in the collection of DNA.  And you

9    must comply with the standard conditions that have been

10   imposed.

11          I'm also going to impose the recommended special

12   conditions that were recommended by the Probation Department.

13   You must obey the immigration law and comply with the

14   directives of immigration authority.  You must participate in

15   an outpatient mental health treatment program approved by the

16   Probation Office.  Must continue to take any prescribed

17   medications unless otherwise instructed by the healthcare

18   provider.  You must contribute to the cost of services rendered

19   based on your ability to pay and the availability of third-

20   party payments.

21          The Court authorizes the release of available

22   psychological and psychiatric evaluations and reports,

23   including the presentence investigation report, to the

24   healthcare provider.

25          You shall submit your person and any property,

K6CALERSps

1   residence, vehicle, papers, computer, and other electronic

2   communication, data storage devices, cloud storage, or media

3   and effects to a search by the United States Probation Office

4   and, if needed, with the assistance of any law enforcement.

5   The search is to be conducted at a reasonable time and in a

6   reasonable manner, when there is reasonable suspicion

7   concerning violation of a condition of your supervision or

8   unlawful conduct by the person being supervised.  Failure to

9   submit to a search may be grounds for revocation of release.

10  You shall warn any occupants at the premises that they also may

11  be subject to searches pursuant to this condition.  Any search

12  shall be conducted at a reasonable time and in a reasonable

13  manner.

14         You must provide the probation officer with any

15  requested financial information.  And you must not incur new

16  credit card charges or open lines of credit unless you're in

17  compliance with the payment schedule.

18         With respect to a fine, what's the government's

19  position?

20         MR. LOCKARD:  Your Honor, I'll address the fine in

21  just a moment.  We had also requested in our sentencing letter

22  that the Court issue an oral order for the forfeiture pursuant

23  to Title 18, Sections 981 and 982, and Title 21, Section 853,

24  of the forfeiture of the proceeds of Mr. Leroux's offenses, as

25  well as the instrumentalities of the money laundering and

K6CALERSps

1    narcotics offenses, with credit for assets that have been

2    confiscated by foreign governments or that the defendant

3    expended in furtherance of law enforcement operations.  And we

4    would propose to submit a written order to the Court following

5    the sentencing.

6            THE COURT:  Yes.  I intended to do that, in an order

7    to that effect.  I will order forfeiture to that effect.

8            With respect to restitution, are you intending to

9    submit a restitution order?

10           MR. LOCKARD:  We will also submit a restitution order

11   under Section 3663(a) of Title 18.

12           THE COURT:  So, again, forfeiture will be ordered as

13   requested by the government.  A restitution order will be

14   submitted within 90 days.

15           I am required to impose the mandatory special

16   assessment of $700, which is a hundred dollars per count, which

17   will be paid immediately.

18           And are you requesting a fine or are you not doing

19   that in light of the forfeiture and restitution orders?

20           MR. LOCKARD:  I think with respect to a fine, we would

21   agree with probation's recommendation.

22           THE COURT:  All right.  So no fine will be imposed.

23           Does either counsel know of any legal reason why this

24   sentence cannot be imposed?

25           MR. BRANDEN:  Jim Branden.  No, Judge.

K6CALERSps

1          THE COURT:  Mr. Leroux, that is the sentence of this

2    Court.  You have a right to appeal your conviction and sentence

3    except to whatever extent you may have validly waived that

4    right as part of your plea agreement.  If you do choose to

5    appeal, the notice of appeal must be filed within 14 days of

6    the judgment of conviction.  If you're not able to pay for the

7    cost of an appeal, you may apply for leave to appeal in forma

8    pauperis, which simply means the court costs and filing fees

9    will be waived.  If you request, the Clerk of Court will

10   prepare and file a notice of appeal on your behalf.

11          Are there any open counts or underlying indictments

12   that need to be dismissed against Mr. Leroux?

13          MR. LOCKARD:  There are, your Honor.  At this time the

14   government moves to dismiss all open counts.

15          THE COURT:  All right.  They will be dismissed.

16          Are there any other applications at this time?

17          MR. CHABROWE:  No, your Honor.

18          THE COURT:  All right.  Thank you.  We're adjourned.

19          MR. CHABROWE:  Thank you.

20          (Adjourned)

21

22

23

24

25